PEN:JPL
F. #2016R01856

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN THE MATTER OF THE SEARCH OF: (1)
ONE WHITE POSH REVEL PRO CELLULAR
PHONE MODEL X510B, IMEI:
356288061609781; (2) ONE WHITE
SAMSUNG GALAXY NOTE II CELLULAR
PHONE, IMEI: 353800050984638; AND (3)
ONE RED ALCATEL CELLULAR PHONE
MODEL OT-208A, MARKED:
012473006458314, INCLUDING ANY
REMOVABLE SIM OR FLASH MEDIA
CARDS CONTAINED THEREIN,
CURRENTLY STORED AT PREMISES
CONTROLLED BY THE U.S.
DEPARTMENT OF HOMELAND
SECURITY, LOCATED IN JAMAICA, NEW
YORK

TO BE FILED UNDER SEAL

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR A
SEARCH WARRANT FOR
ELECTRONIC DEVICES
(CELLULAR PHONES)

17 M 573

Docket No. _____

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, ROBERT MARTINEZ, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of electronic

devices currently in law enforcement possession, further described in Attachment A, and the

extraction from that property of electronically stored information, further described in

Attachment B.

2.      I am a Special Agent with the United Stated Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI"), and have been for approximately 9 years. During that time, I have personally participated in numerous investigations and arrests, the debriefing of witnesses, and the execution of numerous search warrants related to various types of criminal activity including illegal narcotics trafficking and conspiracies to commit the same, among other crimes.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  Unless otherwise indicated, where I describe statements of others, I am describing those statements only in sum and substance, and in part.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) (possession of cocaine with intent to distribute), 846 (conspiracy to distribute cocaine), 952(a) (importation of cocaine) and 963 (conspiracy to import cocaine) (the "Subject Offenses"), have been committed by, among others, JEANNETTE JACQUEZ DE ABREU.

### IDENTIFICATION OF THE DEVICES TO BE EXAMINED

5.      The property to be searched are the following three mobile phones: (1) ONE WHITE POSH REVEL PRO CELLULAR PHONE MODEL X510B, IMEI: 356288061609781; (2) ONE WHITE SAMSUNG GALAXY NOTE II CELLULAR PHONE, IMEI: 353800050984638; AND (3) ONE RED ALCATEL CELLULAR PHONE MODEL OT-208A, MARKED: 012473006458314, INCLUDING ANY REMOVABLE SIM OR FLASH MEDIA CARDS CONTAINED THEREIN (collectively, the "SUBJECT DEVICES"), CURRENTLY

2

STORED AT PREMISES CONTROLLED BY THE U.S. DEPARTMENT OF HOMELAND SECURITY, LOCATED IN JAMAICA, NEW YORK, as set forth in Attachment A.

6.     The applied-for warrant would authorize the forensic examination of the SUBJECT DEVICES for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

### A.     The Investigation

7.     On or about October 5, 2016, JEANNETTE JACQUEZ DE ABREU arrived at John F. Kennedy International Airport in Queens, New York aboard Jet Blue Flight 1010 from Santo Domingo, Dominican Republic.

8.     Upon her arrival, JACQUEZ DE ABREU was selected at the jet bridge for a carry-on enforcement examination by United States Customs and Border Protection ("CBP") officers. JACQUEZ DE ABREU presented one large brown "American Flyer" roller-bag carry-on and a "Victoria's Secret" handbag, and claimed ownership of the bags.

9.     During the baggage examination, a CBP officer opened the American Flyer roller-bag and smelled a strong chemical odor emitted from the bag. Inside that bag, the officer discovered that the bag was mostly empty and contained two cameras, several lenses and two handbags. One of the handbags was a red "Ferrari/Puma" handbag, which felt unusually heavy and appeared to have unusually thick walls. A CBP officer probed the red Ferrari/Puma handbag, revealing a white powdery substance, which field-tested positive for the presence of cocaine. A black "Mini/Puma" handbag was also removed from the American Flyer bag and its lining was probed, revealing a white powdery substance, which field-tested positive for the presence of cocaine. The total approximate gross weight of the cocaine recovered was 3.912

3

kilograms. Thereafter, JACQUEZ DE ABREU was placed under arrest and questioned by HSI Special Agents.[1]

10.     During the post-arrest interview, JACQUEZ DE ABREU also provided written consent to HSI to search one of her mobile phones, a Samsung Galaxy 6S. JACQUEZ DE ABREU also stated that she had travelled from the Dominican Republic with three other mobile devices but that those three devices did not work. At that time, HSI did not examine JACQUEZ DE ABREU's luggage for additional mobile devices or seek her consent to review the contents of any other such devices in the event that they were located. Accordingly, as to any other electronic devices belonging to JACQUEZ DE ABREU, she neither offered her consent nor refused to provide it.

11.     However, based on a subsequent forensic examination of JACQUEZ DE ABREU's Samsung Galaxy 6S, HSI discovered that her recent use of that phone appears to be significantly limited. Although JACQUEZ DE ABREU appears to have used the phone to access the internet, including Google and Facebook, through September 2016, significantly, it also appears that JACQUEZ DE ABREU did not use the Samsung Galaxy 6S to exchange any

---

[1]     Along with another HSI Special Agent, I conducted the post-arrest interview of JACQUEZ DE ABREU primarily in the Spanish language. I am fluent in Spanish. Prior to asking JACQUEZ DE ABREU any questions, I provided her with Miranda warnings both orally and in writing. She stated that she understood those warnings and agreed to waive them and speak with HSI Special Agents. However, during the initial oral advisement of her Miranda warnings, I misspoke and inadvertently advised JACQUEZ DE ABREU that, if she *could* afford an attorney, one would be provided to her. Shortly thereafter, JACQUEZ DE ABREU was advised in writing that if she *could not* afford an attorney, one would be provided to her. In light of these contradictory Miranda warnings, the government did not oppose exclusion at trial of JACQUEZ DE ABREU's post-arrest statements.

telephone calls, short message service (SMS) text messages, or electronic-mail (e-mail)

messages after on or about June 23, 2016.

12.    Since the date of JACQUEZ DE ABREU's arrest, the government has maintained

custody of, among other things, her carry-on luggage, including the luggage described above that

contained the concealed cocaine, as well as her checked luggage, all within a facility that is

controlled by DHS located in Jamaica, New York.

13.    During a subsequent review of the contents of JACQUEZ DE ABREU's checked

luggage, HSI discovered the SUBJECT DEVICES.

14.    The SUBJECT DEVICES are currently in the lawful possession of HSI. As

described above, they were seized by HSI incident to arrest. Therefore, while HSI might already

have all necessary authority to examine the SUBJECT DEVICES, I seek this additional warrant

out of an abundance of caution to be certain that an examination of the SUBJECT DEVICES will

comply with the Fourth Amendment and other applicable laws. HSI has not attempted to power

on any of the SUBJECT DEVICES since they were discovered and, accordingly, their

operability is unknown.

15.    In my training and experience, I believe that the SUBJECT DEVICES have been

stored in a manner in which their contents are, to the extent material to this investigation, in

substantially the same state as they were when the SUBJECT DEVICES first came into the

possession of HSI. Specifically:

    (a)    the white Posh Revel Pro cellular phone model X510B, IMEI:
    356288061609781, appears to be in normal physical condition and does
    not exhibit signs of damage other than what appears to be routine wear
    and tear;

    (b)    the white Samsung Galaxy Note II cellular phone, IMEI:
    353800050984638, has a heavily damaged and cracked display screen but

otherwise does not exhibit signs of damage other than what appears to be routine wear and tear; and

(c)     the red Alcatel cellular phone model OT-208A, marked: 012473006458314, appears to be in normal physical condition and does not exhibit signs of damage other than what appears to be routine wear and tear.

Although JACQUEZ DE ABREU claimed that the SUBJECT DEVICES did not work, their physical appearance does not indicate that the phones are entirely inoperable or incapable of storing data or information. For example, in my experience, even a phone with a damaged display screen may continue to function and store information.

16.     On or about November 3, 2016, a grand jury empaneled in the Eastern District of New York returned an indictment charging JACQUEZ DE ABREU with importation of cocaine into the United States and possession of cocaine with intent to distribute, in violation of Title 21, United States Code, Sections 952(a) and 841(a)(1), respectively. A copy of the indictment is attached as Exhibit 1 and is incorporated herein by reference.

**B.     Characteristics of Persons Who Engage in Illegal Narcotics Trafficking**

17.     Based upon my training and experience, I know that those who import, distribute and possess with intent to distribute narcotics do not act alone and often communicate with co-conspirators by means of wireless telephones such as the SUBJECT DEVICES. Those who commit such offenses may also retain evidence of their participation in such crimes on wireless telephones through, among other things, call records, text messages, Facebook messages, WhatsApp messages, e-mails or photos. Based upon my knowledge, training and experience, I know that those who commit the Subject Offenses often communicate by means of text or e-mail messages.

6

18.     As noted above, HSI recovered the SUBJECT DEVICES from JACQUEZ DE

ABREU's luggage after finding cocaine in her luggage.  Based upon my training and experience

with cases involving drug couriers who arrive at the airport with narcotics concealed in their

luggage, I know that such individuals are commonly instructed to call someone, or accept a call

from someone, upon arrival to the United States to arrange delivery of the narcotics.[2]  I also

know that drug couriers often save in their wireless telephones, contact information related to

directions for the delivery of narcotics.  Additionally, items such as removable "sim" cards and

"flash media" cards can be inserted into cellular telephones like the SUBJECT DEVICES, and

can store information, such as contact information and other media files, separate and apart from

those files stored on the cellular telephones themselves but for use on such devices.

19.     Based upon the foregoing, there is probable cause to believe there is evidence,

fruits and instrumentalities of the Subject Offenses currently stored on the SUBJECT

DEVICES.  First, based upon my knowledge, training and experience, I know that those who

commit the Subject Offenses may own, operate and maintain multiple cellular telephones at a

time and rotate and discard such devices after relatively brief periods of usage.  Rotating and

maintaining multiple cellular devices is a common technique used by those who commit the

Subject Offenses to attempt to limit law enforcement's ability to track or quantify the scope of

their unlawful activity or obtain evidence of the same.  Here, JACQUEZ DE ABREU possessed

multiple internationally-transported mobile phones.  Notably, as described above (see ¶¶ 10-11),

---

[2]     Indeed, during her post-arrest interview, JACQUEZ DE ABREU indicated that
she expected to receive a telephone call from the person who provided her with the carry-on
luggage that contained the cocaine.

she provided her consent to search the one phone that appears not to have been used for many months to make telephone calls or sending text or e-mail messages, but claimed that the other phones in her possession were broken or inoperable.   Thus, it appears more likely that some or all of the other three phones were used by traffickers, including JACQUEZ DE ABREU, to communicate regarding the drug importation scheme.

## TECHNICAL TERMS

20.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text and e-mail messages; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device, or usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various

8

types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.

           b.        Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  As noted above, removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

           c.        Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media, like the types described above.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

           d.        GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (GPS) consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a

mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

   e.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

   f.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

  21.  Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications, I know that the SUBJECT DEVICES have capabilities that allow them to serve as wireless telephones and text messaging devices. Moreover, the Posh Revel Pro cellular phone, IMEI: 356288061609781, and Samsung Galaxy Note II cellular phone, IMEI: 353800050984638, have many other features that allow them to serve as digital cameras, portable media players, GPS navigation devices, Internet web

browsers, and more.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, or other individuals who communicated with the user or users of the SUBJECT DEVICES.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

22.      Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

23.      *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICES were used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICES because:

a.        Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.        Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

11

c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

24.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the SUBJECT DEVICES consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

25.   *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

12

## CONCLUSION

26.    I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the SUBJECT DEVICES described in Attachment A to seek the

items described in Attachment B.

Respectfully submitted,

*Robert Martinez*

ROBERT MARTINEZ
Special Agent
U.S. Department of Homeland Security,
Homeland Security Investigations



Subscribed and sworn to before me
this 23rd day of June 2017

s/ Bloom

THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

13

**EXHIBIT 1**
(Indictment)

BRODIE, J.

JD:JPL
F. #2016R01856

GOLD, M.J.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

JEANETTE JACQUEZ DE ABREU,

          Defendant.

- - - - - - - - - - - - - - - - -X

I N D I C T M E N T

**CR 16     564**

(T. 21, U.S.C., §§ 841(a)(1), 841(b)(1)(C),
952(a), 960(a)(1) and 960(b)(3); T. 18,
U.S.C., §§ 2 and 3551 et seq.)

THE GRAND JURY CHARGES:

COUNT ONE
(Importation of Cocaine)

On or about October 5, 2016, within the Eastern District of New York and

elsewhere, the defendant JEANETTE JACQUEZ DE ABREU, together with others, did

knowingly and intentionally import a controlled substance into the United States from a

place outside thereof, which offense involved a substance containing cocaine, a Schedule II

controlled substance.

(Title 21, United States Code, Sections 952(a), 960(a)(1) and 960(b)(3);

Title 18, United States Code, Sections 2 and 3551 et seq.)

COUNT TWO
(Possession of Cocaine with Intent to Distribute)

On or about October 5, 2016, within the Eastern District of New York, the

defendant JEANETTE JACQUEZ DE ABREU, together with others, did knowingly and

2

intentionally possess with intent to distribute a controlled substance, which offense involved

a substance containing cocaine, a Schedule II controlled substance.

(Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C); Title 18,

United States Code, Sections 2 and 3551 et seq.)

A TRUE BILL

_____
FOREPERSON

ROBERT L. CAPERS
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

By: _____
Assistant U.S. Attorney

F. #2016R01856

FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

*vs.*

*JEANETTE JACQUEZ DE ABREU,*

Defendant.

# INDICTMENT

(T. 21, U.S.C., §§ 841(a)(1), 841(b)(1)(C), 952(a), 960(a)(1) and 960(b)(3); T. 18, U.S.C., §§ 2 and 3551 et seq.)

*A true bill.*

_____
*Foreperson*

*Filed in open court this* _____ *day,*

*of* _November_ _ A.D. 20 _16_

_____
*Clerk*

*Bail, $* _____

*Jonathan P. Lax, Assistant U.S. Attorney (718) 254-6139*

## ATTACHMENT A
(Particular Property To Be Searched)

The property to be searched are the following three mobile phones:

(1)     ONE WHITE POSH REVEL PRO CELLULAR PHONE MODEL X510B, IMEI: 356288061609781;

(2)     ONE WHITE SAMSUNG GALAXY NOTE II CELLULAR PHONE, IMEI: 353800050984638; and

(3)     ONE RED ALCATEL CELLULAR PHONE MODEL OT-208A, MARKED: 012473006458314,

including any sim or flash media cards contained therein (collectively, the "SUBJECT DEVICES"), all of which is currently stored at premises controlled by the U.S. Department of Homeland Security, located in Jamaica, New York.

This warrant authorizes the forensic examination of the SUBJECT DEVICES for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B
### (Particular Things To Be Seized)

1.　　All records and information on the SUBJECT DEVICES that relate to violations of Title 21, United States Code, Sections 841(a)(1) (possession of cocaine with intent to distribute), 846 (conspiracy to distribute cocaine), 952(a) (importation of cocaine), and 963 (conspiracy to import cocaine) (the "Subject Offenses") and involve JEANNETTE JACQUEZ DE ABREU since June 2016, including:

　　　　a.　　Contents of call logs, text messages, emails, instant messages, photographs, videos, WhatsApp messages, Facebook messages, Internet activity (including browser history, web page logs, and search terms entered by the user);

　　　　b.　　Lists of customers and related identifying information;

　　　　c.　　Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

　　　　d.　　Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

　　　　e.　　Any information recording JACQUEZ DE ABREU's schedule or travel;

　　　　f.　　Bank records, checks, credit card bills, account information, and other financial records.

2.　　Evidence of user attribution showing who used or owned the SUBJECT DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.　　Contextual information necessary to understand the evidence described herein, all of which constitutes evidence, fruits and instrumentalities of the Subject Offenses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.